

FILED
CLERK, U.S. DISTRICT COURT
9/1/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: ___CD___ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CR No. 2:23-cr-00438-JAK |
|---|---|
| Plaintiff, | I N F O R M A T I O N |
| v. | [18 U.S.C. § 371: Conspiracy to Commit Wire Fraud] |
| TAMARIS MASSENGALE, | |
| Defendant. | |

The United States Attorney charges:

[18 U.S.C. § 371]

A.  INTRODUCTORY ALLEGATIONS

At times relevant to this Information:

Defendant and the Relevant Entities

1. Defendant TAMARIS MASSENGALE was a resident of Lancaster, California.

2. Co-Conspirator Amber Singleton, also known as ("aka") "Crystal Kelly," aka "Rebecca Lee," aka "Rebecca A Lee," aka "Rebecca Ann Lee," aka "Mia Lockett," aka "Mia Peire Lockett," aka "Crystal McClellan," was a resident of Canyon Lake, California.

3. Co-Conspirator Emanuel Tucker was a resident of Canyon Lake, California, where he lived with Singleton.

4. Company 1 was a Wyoming-based corporation that specialized in selling aged "shelf companies" (i.e., companies that were created and existed without any operations but provided the imprimatur of an established entity) that were incorporated in New Mexico, Montana, and Wyoming. The shelf companies were home-based businesses that were entirely owned by one person. Upon receipt of an application and payment for an aged shelf company, Company 1 provided various documents and services for each aged shelf company it sold, including Articles of Incorporation/Organization, a Certificate of Good Standing, an operating agreement and bylaws, and registered-agent services until the year following the year the shelf company was purchased.

5. Between in or around February 2020 and in or around May 2020, defendant MASSENGALE, with the assistance of Co-Conspirators Singleton and Tucker, and others, purchased aged shelf companies from Company 1, including Order America Inc., a Wyoming company, and Distribugo Inc., a Montana company (collectively, the "Shelf Companies").

 The Paycheck Protection Program

6. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 that was designed to provide emergency financial assistance to Americans suffering economic harm as a result of the COVID-19 pandemic.  One form of assistance provided by the CARES Act was the authorization of United States taxpayer-funded forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").

7. In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application signed by an authorized representative of the business. The PPP loan application required the small business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. One such certification required the applicant to affirm that "[t]he [PPP loan] funds w[ould] be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments." The applicant (through its authorized representative) was also required to acknowledge that "I understand that if the funds are used for unauthorized purposes, the federal government may pursue criminal fraud charges." In the PPP loan application, the applicant was required to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, the applicant was required to provide documentation showing its payroll expenses.

8. A business's PPP loan application was received and processed, in the first instance, by a participating financial institution approved by the United States Small Business Administration ("SBA"). If a PPP loan application was approved, the participating financial institution funded the PPP loan using its own monies. The SBA guaranteed the loans funded under the PPP.

9. PPP loan proceeds were required to be used by the business on certain permissible expenses, namely, payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business

spent the loan proceeds on these expenses within a designated period of time and used at least a minimum amount of the PPP loan proceeds towards payroll expenses.

10.  The PPP also allowed certain eligible borrowers that had previously received a PPP loan to apply for a second PPP loan, with the same general loan terms as their first PPP loan.  These "second-round" loans could be used for the same purposes as were permitted for the first PPP loans, including payroll costs, interest on mortgages, rent, and utilities.

<u>The Economic Injury Disaster Loan Program</u>

11.  The Economic Injury Disaster Loan Program ("EIDL") was an SBA program that provided low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters.

12.  The CARES Act authorized the SBA to provide EIDL loans of up to $2 million to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic.

13.  To obtain an EIDL loan, a qualifying business was required to submit an application to the SBA and provide information about the business's operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster.  In the case of EIDL loans for COVID-19 relief, the 12-month period was the 12-month period from January 31, 2019, to January 31, 2020.  The applicant was also required to certify that all of the information in the application was true and correct to the best of the applicant's knowledge.

14.  EIDL loan applications were submitted directly to the SBA and processed by the agency with support from a government

contractor.  If the application was approved, the amount of the loan was based, in part, on the information provided by the applicant about employment, revenue, and cost of goods sold.  Any funds issued under an EIDL loan were issued directly by the SBA.

15.  EIDL loan funds could be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments.

B.   THE OBJECT OF THE CONSPIRACY

16.  Beginning in or around February 2020 and continuing until at least in or around April 2021, in Los Angeles, Orange, and Riverside Counties, within the Central District of California, and elsewhere, defendant MASSENGALE conspired with others known and unknown to the United States Attorney to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

C.   MANNER AND MEANS OF THE CONSPIRACY

17.  The object of the conspiracy was to be carried out, and was carried out, in substance, as follows:

   a.   Between in or around February 2020 and in or around May 2020, defendant MASSENGALE, with the assistance of Co-Conspirators Singleton and Tucker, and others, purchased the Shelf Companies from Company 1 for the purpose of obtaining federal government loans.

   b.   Defendant MASSENGALE, Co-Conspirator Singleton, and others would submit and cause to be submitted electronic applications for PPP and EIDL loans on behalf of companies that defendant MASSENGALE owned and controlled, including the Shelf Companies that defendant MASSENGALE and Co-Conspirator Singleton had previously purchased from Company 1.

5

   c. Defendant MASSENGALE, Co-Conspirator Singleton, and others would knowingly make and cause to be made false statements to financial institutions in connection with the applications for PPP loans, including false statements about (i) the number of employees at the relevant company; (ii) the amount of average monthly payroll for those employees; (iii) the truth and accuracy of all the information and documents submitted in or with the applications, including attached Internal Revenue Service ("IRS") forms; and (iv) the intended use of the loan proceeds, including false certifications that the loan proceeds would be used for permissible business purposes.

   d. Defendant MASSENGALE, Co-Conspirator Singleton, and others would knowingly make and cause to be made false statements to the SBA in connection with the applications for EIDL loans, including false statements about (i) the number of employees at the relevant company; (ii) the gross revenue for the 12-month period preceding the identified disaster; (iii) the cost of goods sold in the 12-month period preceding the identified disaster; (iv) the truth and accuracy of all the information and documents submitted in or with the applications; and (v) the intended use of the loan proceeds, including false certifications that the loan proceeds would be used for permissible business purposes, certifying to the SBA under penalty of perjury to "use all the proceeds" of the loans "solely as working capital to alleviate economic injury caused by disaster" consistent with the terms and limitations of the EIDL program.

   e. After the financial institutions and the SBA funded the applied-for PPP and EIDL loans, respectively, defendant MASSENGALE, Co-Conspirator Singleton, and their co-conspirators would

transfer and cause to be transferred the proceeds of the fraudulently obtained loans to bank accounts in their control.

   f. Defendant MASSENGALE would then transfer portions of the loan proceeds obtained as a result of the fraudulent applications to Co-Conspirators Singleton and Tucker in the form of "kickback" payments.

   g. Defendant MASSENGALE, Co-Conspirator Singleton, and other co-conspirators would use the fraudulently obtained PPP and EIDL loan proceeds for their own personal benefit in a manner inconsistent with the requirements of the PPP and EIDL programs.

  18. In total, between in or around April 2020 and in or around April 2021, Co-Conspirator Singleton, and others, with the knowledge and consent of defendant MASSENGALE, submitted and caused the submission of at least five false and fraudulent PPP and EIDL loan applications listing defendant MASSENGALE as the owner of the applicant companies, and transmitted these applications via interstate wires to the SBA and participating financial institutions, resulting in the funding and disbursement of approximately $644,433.50 in loan proceeds.

D. <u>OVERT ACTS</u>

  19. On or about the following dates, in furtherance of the conspiracy and to accomplish its object, defendant MASSENGALE, Co-Conspirator Singleton, and others, committed the following overt acts, among others, in Los Angeles, Orange, and Riverside Counties, within the Central District of California, and elsewhere:

  <u>Overt Act No. 1</u>: On May 1, 2020, defendant MASSENGALE, Co-Conspirator Singleton, and others filed and caused to be filed with a financial institution a PPP loan application seeking $187,493 on

behalf of TMK Administrative Consultant LLC, falsely representing that TMK Administrative Consultant LLC had nine employees and average monthly payroll of $74,997.

Overt Act No. 2:   On May 14, 2020, defendant MASSENGALE, Co-Conspirator Singleton, and others filed and caused to be filed with a financial institution a PPP loan application seeking $30,248 on behalf of Order America Inc., falsely representing that Order America Inc. had six employees and average monthly payroll of $12,100.

Overt Act No. 3:   On June 17, 2020, defendant MASSENGALE, Co-Conspirator Singleton, and others filed and caused to be filed with the SBA an EIDL application in the name of TMK Administrative Consultant LLC, falsely indicating that TMK Administrative Consultant LLC had ten employees as of January 1, 2020, and gross revenues in the amount of $259,000 from January 31, 2019 to January 31, 2020.

Overt Act No. 4:   On June 21, 2020, defendant MASSENGALE, Co-Conspirator Singleton, and others filed and caused to be filed with the SBA an EIDL application in the name of Order America Inc., falsely representing that Order America Inc. had six employees as of

//
//
//

January 1, 2020, and gross revenues in the amount of $710,000 from January 31, 2019, to January 31, 2020.

```
                                E. MARTIN ESTRADA
                                United States Attorney


                                MACK E. JENKINS
                                Assistant United States Attorney
                                Chief, Criminal Division

                                RANEE A. KATZENSTEIN
                                Assistant United States Attorney
                                Chief, Major Frauds Section

                                KRISTEN A. WILLIAMS
                                Assistant United States Attorney
                                Deputy Chief, Major Frauds Section

                                VALERIE L. MAKAREWICZ
                                Assistant United States Attorney
                                Major Frauds Section


                                GLENN S. LEON
                                Chief, Fraud Section
                                Criminal Division
                                United States Department of Justice

                                EDWARD E. EMOKPAE
                                Trial Attorney, Fraud Section
                                Criminal Division
                                United States Department of Justice
```